UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LAURA PARKER, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | NO. 3:06-CV-767 PPS |
| ZIMMER, INC., RON RIEWOLDT, HEIDI ) | |
| MITCHELL, and JOHN MCSHANE, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Laura Parker brought suit against her former employer, Zimmer, Inc., after resigning from her position in the company's information technologies department.  Parker also named her individual supervisors Patric Riewoldt (incorrectly sued as "Ron" Riewoldt), Heidi Mitchell and John McShane as defendants.  Parker alleges that Defendants violated her rights under the ADA as well as the FMLA.  Parker, despite her unquestionably difficult and painful struggles with cancer, cannot be considered a qualified individual with a disability under the ADA.  In addition, the FMLA does not provide a remedy for Parker, as her situation was not so intolerable as to be characterized as a constructive discharge, she suffered no monetary losses as a result of defendants' actions, and she does not seek equitable relief such as reinstatement.  Moreover, there is an absence of similarly situated employees found in the record to support Parker's retaliation claim.  For these reasons, Defendants' Motion for Summary Judgment [DE 47] is GRANTED.

**FACTUAL BACKGROUND**

From 1991 through 2006, Parker worked at Zimmer as a Senior Programmer/Analyst. (Riewoldt Decl. ¶ 4.) Zimmer manufactures orthopedic and other surgical and trauma products. (*Id*. ¶ 2.) In May of 2001, Parker was diagnosed with malignant, metastatic melanoma, and as a result of the subsequent treatments, she acquired lympodema and deep vein thrombosis, or blood clots, in her legs. (Am. Complaint ¶ 3; Parker Dep. at 35-36.) She suffers from leg swelling if she sits with a 90º bend for a long period of time. (*Id*. at 32.) In 2002, she was diagnosed with a brain tumor, and in 2003, she was treated for a second. (*Id*. at 56.) She took three separate short term disability leaves relating to her cancer. (*Id*. at 117.) As a result of her cancer treatments, she has a compromised immune system, and she is consequently susceptible to taking ill with colds and viruses. (*Id*. at 57.) She also takes anti-seizure medication, which causes fatigue. (*Id*. at 58.)

When at Zimmer, Parker had to take various steps to avoid complications from her leg blood clotting and the leg swelling which occurred if she sat at a desk in the "normal" way for a majority of the day. (*Id*. at 32.) For example, she wore very high compression stockings, and she had to lay down when she got home from work with her feet elevated above her heart. (*Id*. at 32-33.) In October 2003, she requested a laptop to keep her legs elevated while working, which Zimmer provided. (*Id*. at 61, 63-65.) Zimmer also purchased for her a chair which partially reclined that Parker used for a while, and then made available for her a second "big leather executive chair" that reclined more. (*Id*. at 68.) Parker recalls talk of obtaining a standing podium for her office use, but does not remember why it never materialized. (*Id*. at 67.) She does acknowledge that Zimmer never formally refused her request. (*Id*.)

2

Parker also admits facts which show that her leg swelling did not completely interfere with her day-to-day activities. She stated that on weekends, she did "normal weekend things" such as cleaning the house and walking around, and that she is able to take care of herself in every way. (*Id*. at 57, 60.) She works out and rides her bicycle in the summer. (*Id*. at 60.) She typically spent her two daily twenty minute breaks at Zimmer by sitting in the break room with her co-workers, as opposed to standing or keeping her legs elevated to avoid leg swelling. (*Id*. at 117.).

One of Parker's requests for accommodation was not granted. In October 2003, she left voicemails with Pat Riewoldt, her supervisor, asking if she could work from home with her laptop when her legs were swollen. (*Id*. at 61.) Parker insists that her request was not one for permanent or long-term home status, but instead for one or two days a month. (*Id*.) Zimmer states that it understood Parker's request to be for work at home on a regular basis for her convenience rather than for medical reasons, but concedes that for purposes of its Motion for Summary Judgment, the factual dispute is not relevant because all reasonable inferences must be made in favor of Parker. (Pl.'s Br. [DE 48] at 12, n. 2). In December 2003, after not hearing anything about her request, Parker pressed Riewoldt about the home request. (*Id*. at 62.) He informed Parker that her request was denied because "Zimmer did not want to set a precedent" by letting her work from home. (*Id*.) Riewoldt said that the decision had been reached after he discussed the matter with John McShane, Chief of Information Services. (*Id*. at 63.)

In 2003, Parker was in the midst of battling her brain tumors and other ailments related to her cancer. (*Id*. at 36-37, 56). She reached an agreement with Riewoldt and Heidi Mitchell, Human Resources Director, whereby Parker would, when not on one of her paid short-term

3

disability leaves, use vacation time or FMLA when her doctors' appointments required her to be off work for more than four hours a day. (Def.'s Br. [DE 50], Ex. 10 at 1.)

Matters changed in January 13, 2006, when Mitchell and Riewoldt presented Parker with a written warning and Attendance Improvement Plan concerning her attendance. (*Id.*, Ex. 3). The letter listed ten different days in 2005 for which Parker was absent because of illness, four days when she missed half the day to illness, and noted she missed thirty-three other hours due to coming in late for doctor's appointments. (*Id.*)  The Improvement Plan stated that Parker was expected to work from 8:00 a.m. to 5:00 p.m. each day, with an hour for lunch, and additional weekend or after-hours time as needed. (*Id.*)  It also stated that personal appointments would need to be scheduled outside of work hours or during days taken as vacation time, and that absences for appointments or vacation must be scheduled one week in advance. (*Id.*)  Lastly, the letter warned Parker that failure to correct her attendance could lead to her termination, and that Riewoldt would be meeting with Parker weekly to go over her progress. (*Id.*).

Parker claims that she was "blind sided" by the warning and her placement on the Attendance Improvement Plan because her supervisors never addressed their concerns about her 2005 absences prior to that time. (Def.'s Br. [DE 50] at 4.)  She also asserts that she was treated differently than other employees by being placed on the plan, and offers as proof a collection of emails written by co-workers at Zimmer, wherein they notified others that they would be working from home for reasons such as doctors' appointments. (*Id.*, Ex. 19.)

It did not take long for Parker to run afoul of the Attendance Improvement Plan and its seven-day notice requirement. Her difficulties stemmed from the fact that her doctors diagnosed her for what they believed to be a possible cancer recurrence. (Parker Dep. at 134.)  Things

4

came to a head between her and Zimmer in late January, less than month after being placed on the plan. She informed Riewoldt via a Tuesday, January 31, 2006 email that she would need to take off the subsequent Friday for a doctor's visit. (Def.'s Br. [DE 50], Ex. 6). Riewoldt responded that he was okay with Parker taking Friday off as vacation, but added that Parker should "remember in the future I really must have a week's notice for scheduled appointments during working hours." (*Id*.) When Parker remarked that if she "would have had a week" she would have provided more notice, Riewoldt replied more brusquely. He stated that doctors' appointments should be rescheduled to allow for the week notice, and that this was the second time she failed to comply with that requirement of the Attendance Improvement Plan. (*Id*.) In the prior week, Parker had quickly scheduled a spleen-removal surgery because it appeared that the cancer had spread there. (*Id*.)  In the end, the spleen removal surgery did not take place, as, apparently, Parker's doctors determined that the cancer was not in her spleen. (*Id*.)

Parker sent her letter of resignation on February 21, 2006, effective two weeks later. (Def.'s Br. [DE 50], Ex. 7.) She stated that she "cannot continue to function in this environment, worrying constantly that I will do something that will lead to my termination." (*Id*.)  On the same day, she informed Reiwoldt that her decision was made "in the best interest of my health." (*Id*.) In a follow up letter, she stated that "[s]ince my chronic issues will not change, I feel I have no choice but to leave the company." (Def.'s Br. [DE 50], Ex. 9.) Parker also stated that she "concluded that she was a liability to the corporation, perhaps costing them too much money." (Def.'s Br. [DE 50] at 6.)

Parker later revealed in her deposition that her health concerns were not the real reasons for her resignation. In the first or second week of January, she learned from Riewoldt that

5

Zimmer was placing Parker on a new system application and that she might be working under a new manager, Pat Hanlon. (Parker Dep. at 48-52). Parker felt she had been sexually harassed by Hanlon when he made inappropriate remarks to her at a 1999 business conference. (*Id*.) Upon finding out in 2006 that she might be working for Hanlon, she told Riewoldt, "if I have to work for Pat Hanlon . . .I'll have to leave." (*Id*. at 52.) She also told Riewoldt and McShane that she didn't feel that she could "withstand the stress of working for Pat Hanlon and abide by the attendance policy." (*Id*. at 52-53).

At the time of her resignation, Parker was in the process of obtaining FMLA certifications, as evidenced by her communications with both her supervisors and doctors in attempting to obtain the proper certification forms. (*Id*. at 99-100.) She never lost pay as a result of her medical conditions. (*Id*. at 117.) Nor did she suffer the loss of any health benefits, as she relied solely on her husband's employer's medical insurance and never participated in Zimmer's. (*Id*. at 132, 140.)

After her resignation, Parker took on various positions with different employers. Between October 2006 and December 2007, she worked for Kohl's in customer service, First Federal Savings Bank as a teller, and at another company as a data entry clerk. (*Id*. at 20-23.) During that period, she was absent a total of one day on account of health. (*Id*. at 20, 22, 28.) Parker performed each position while standing. (*Id*. at 19-22.)

## **DISCUSSION**

Zimmer requests summary judgment which is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health*

*Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When examining the evidence, I must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

**I.      Parker's ADA Claims**

The ADA prohibits employers from discriminating against a qualified employee on the basis of a disability. 42 U.S.C. § 12112(a). A plaintiff may show discrimination on the basis of disability in either of two ways: by showing a failure to accommodate or by presenting evidence of disparate treatment. *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). Parker's complaint alleges that both forms of discrimination took place. But before addressing either of those claims, I must first addressed whether Parker is "disabled" under the ADA. *See Burnett v. LFW Inc.*, 472 F.3d 471, 483 (7th Cir. 2006). For if she is not, the ADA claim must be dismissed.

Parker has the burden to establish that she has a disability as defined by the ADA. Disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."42 U.S.C. § 12102(2). Parker does not argue that she was "regarded as" disabled by Zimmer. She only proceeds under the first two definitions of "disability."

7

Simply being diagnosed with cancer is not a disability *per se* for purposes of the ADA. *Burnett*, 472 F.3d at 483 (7th Cir. 2006). This is because a disease is only deemed a "disability" if it limits a major life activity. This determination must be made on a case-by-case basis. *Id*.; 29 C.F.R. § 1630.2(j). The ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996); 29 C.F.R. § 1630.2.

Parker has not identified a major life activity that she is unable to do. She only states that the effect of her cancer was reflected in her "fight for her very own survival" as well as her attendance record. *See* Def.'s Br. [DE 50] at 9-10. Giving her the benefit of the doubt, I can only interpret this statement as proposing two separate major life activities for her claim: (1) living and (2) working.

The claim of "living" as a major life activity is easily disposed of. First, the regulations construing the ADA sensibly do not define the phrase "major life activity" to include "living"; probably because of the circular nature of such a proposition. 29 C.F.R. § 1630.2(i). Parker has also not directed me to any cases which hold that living is a major life activity. One case that I have located squarely held that it is not. *United States v. Happy Time Day Care Center*, 6 F. Supp. 2d 1073, 1081-82 (W.D. Wis. 1998)("[L]iving is not a major live activity within the meaning of the ADA."). And the Seventh Circuit, albeit in dicta, has hinted at the same thing. *See Knapp v. Northwestern University*, 101 F.3d 473, 479 (7th Cir. 1996).

"Working" is a closer call. The ADA was implemented to help disabled individuals who can work but are unfairly excluded from employment because of the discriminatory judgments

8

and actions of potential employers. *See Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). By basing a claim on an inability to work, a plaintiff would seem to admit that its employer was not colored by discriminatory thinking at all, but instead making a correct assessment of an employee's ability to perform his or her job. Parker concedes as much when she says that she concluded she was a liability to the company and costing it too much money. *See* Def.'s Br. [DE 50] at 6. The Supreme Court has itself expressed doubt about working as a major life activity, but has thus far refrained from dismissing these claims as a rule. *See Toyota Mfg.,* 534 U.S. 184, 200 (2002)("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999)(observing that a claim based on working as a major life activity "seems to argue in a circle," and that the EEOC has suggested that working be viewed as a major life activity only as a "last resort.") (citations and quotations omitted).

Perhaps with these conceptual difficulties in mind, the Seventh Circuit has embraced the EEOC regulations providing that plaintiffs presenting "working" claims under the ADA must do more than show that their purported disabilities prevented them from working in one, isolated job position. *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005). "Under the ADA, the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Burnett*, 472 F.3d at 484; 29 C.F.R. § 1630.2(j)(3)(i). "Rather, the term substantially limits means significantly restricted in the ability to perform either a *class of jobs* or a *broad range of jobs* in various classes as compared to the average person having comparable training, skills and abilities." *Burnett*, 472 F.3d at 484 (emphasis in

9

original).  So, for example, in *Sutton*, a pilot with impaired vision was found to not be significantly limited in working because he was able to perform other jobs with his skills e.g., pilot instructor.  527 U.S. at 492; *see also*, *Burnett*, 472 F.3d at 483-84 (finding that plaintiff failed to show that his cancer, which caused frequent urination and a temporary restriction on heavy lifting and strenuous activity, did not substantially limit his ability to perform a class or broad range of jobs.)  When determining whether a plaintiff has been significantly restricted in this manner, courts may look at "the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job expectations and training." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 953 (7th Cir. 2000)(quoting *Byrne v. Board of Educ.*, 979 F.2d 560, 564 (7th Cir. 1992)).

      Parker has not identified any class of jobs or broad range of jobs that she is unable to perform with her specific skills because of her cancer.  She has presented no evidence related to employment demographics or occupational classifications to show how many jobs she has been excluded from. *See Kupstas*, 398 F.3d at 612-13 (7th Cir. 2005).  Although precise "qualitative evidence" is not an absolute prerequisite, Parker must put forward *some* evidence that her cancer significantly restricts her ability to meet the requirements of other jobs. *Peters v. City of Mauston*, 311 F.3d 835, 843-44 (7th Cir. 2002).  Indeed, there is only evidence to the contrary.

      When confronted with a list of her job functions for her former position at Zimmer, she said she could perform all of them if she was provided a laptop to work at home, except for attending meetings. *See* Parker Dep. at 151.  It seems she did not even need this much help, as she carried out several jobs following her resignation from Zimmer without the benefit of a home accommodation.  Parker testified that over the fourteen months working in other jobs after

10

resigning from Zimmer, she was absent only one day for her own health related issues. Although those jobs allowed her to stand and thus avoid her leg swelling complications, she also admitted that while at Zimmer, she could have similarly avoided the problem by lying on the floor with her legs elevated. This evidence shows her limitations towards working were relatively slight, not "considerable" or to the "large degree" necessary to qualify as a disability under the ADA. *Toyota*, 534 U.S. at 691. Comparisons to these post-Zimmer positions aside, she has simply not met her burden because she has failed to suggest any other class or broad range of jobs for which she was excluded as a result of her illness.

The second definition of disability relied on by Parker is reserved for those with "a record" of an impairment which substantially limits one or more of the major life activities. 42 U.S.C. § 12102(2)(B). This method is available to individuals who have a history of such impairment, who may or may not have recovered, but are still vulnerable to fears and stereotypes of their employers. *See Davidson v. Midlefort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998)(quoting 29 C.F.R. § 16320.2(k)). But whether one proceeds under the actual impairment prong or under the "record of impairment" prong, the plaintiff must still identify a major life activity that she is substantially limited in. *Mattice v. Memorial Hospital of South Bend, Inc.*, 249 F.3d 682, 686 (7th Cir. 2001). Although the record makes clear that Parker has undergone a continuing struggle with her cancer since its onset in 2001, there still remains no identifiable major life activity which has substantially limited her. If I assume that Parker relies on the activities of "living" and "working" for this second definition of disability (she has not said so explicitly), those activities fail for the same reason as noted earlier; because "living" cannot be a disability for purposes of the ADA and there is no evidence suggesting her ability to work has

been substantially limited or that she is unable to perform a broad range or class of jobs.

## II.     Parker's FMLA Claims

Moving away from the ADA, Parker also brings claims of FMLA interference and retaliation.  The FMLA makes available to eligible employees up to twelve weeks of leave during any twelve-month period for the inability of the employee himself to perform the functions of his position because of a serious health condition. 29 U.S.C. § 2612(a)(1).  At the conclusion of a qualified-leave period, the employee is entitled to return to his former position of employment, or to an equivalent one, with the same terms and benefits. *Id.* § 2614(a)(1); *Harrell v. U.S. Postal Service*, 445 F.3d 913, 919 (7th Cir. 2006).  An employer's interference, restriction, or denial of an employee's FMLA rights forms the basis of an FMLA interference claim, § 2615(a)(1), and an employer's retaliation against an employee for her choice to exercise those rights is the basis of an FMLA retaliation claim, § 2615(b).

### A.     Remedy

Summary judgment is warranted because Parker received no demonstrable injury or prejudice from Zimmer's actions, and so the FMLA provides no remedy for Parker in this case. There are three forms of remedy available to an employee after an employer violates her FMLA rights.   First, the employee may obtain compensation for wages, salary, and benefits lost  "by reason of the violation."  § 2617(a)(1)(A)(i)(I).  Second, she may receive compensation for any actual monetary losses sustained "as a direct result of the violation."  § 2617(a)(1)(A)(i)(II). Third, she is entitled to "appropriate" equitable relief, including employment, reinstatement, and promotion.  § 2617(a)(1)(B). Summary judgment is appropriate against an employee seeking FMLA claims where none of the three remedies are applicable.  *See Harrell*, 445 F.3d at 928;

12

*Cianci v. Pettibone Corp.*, 152 F.3d 723, 728-29 (7th Cir. 1998). "Even when an employee proves that his employer violated § 2615, § 2617 provides no relief unless the employee has been prejudiced by the violation." *Harrell*, 445 F.3d at 928 n. 10 (quoting *Cavin v. Honda of America Mfg.*, 346 F.3d 713, 726 (6th Cir. 2003)).

For example, in *Harrell*, the Post Office called an employee's doctor to determine whether he was in a condition to return to work. This represents a violation of the FMLA when an employee has already submitted a complete certification signed by a health care provider. 445 F.3d at 928. However, the Seventh Circuit found the employee could point to no remedy available under the FMLA because he was not harmed by the unauthorized contact with his physician, and therefore affirmed the lower court's granting of summary judgment on his claim. *Id.*; *see also*, *Cianci*, 152 F.3d at 728-29 (holding that plaintiff had no claim under FMLA because she had suffered no diminution in income and incurred no costs as a result of alleged violation).

Parker does not ask for any equitable relief such as being returned to her old position; she only seeks compensatory damages. She cannot claim a loss of medical benefits because she did not participate in Zimmer's health care coverage during her employment, but instead used the one provided by her husband's employer. She also admits she never lost any pay in relation to her medical related absences while at Zimmer. Her placement on the Attendance Improvement Plan, in and of itself, did not result in any demonstrable loss for Parker and so also stands outside the remedy provided for by FMLA. *See e.g., Lakes v. Colgate-Palmolive Co.*, 2008 WL 833241, at * 13 (S.D. Ind. March 27, 2008)(rejecting FMLA interference and retaliation claims because, though Plaintiff was disciplined for absences covered under FMLA, he was paid for those

13

absences and therefore received no tangible consequences.)   In the end, Parker was not terminated for her FMLA activities; she resigned.  Accordingly, Parker is only entitled to lost salary and wages if she can prove that she was forced to resign – that is, that she was constructively discharged.

To establish a constructive discharge, the employee has to show that the employer made the working conditions so intolerable as to force a reasonable person to leave. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000)(examining constructive discharge in ADA context). Once that showing has been made, the plaintiff has to establish that the intolerable working conditions occurred as a result of the employer's interference with, or retaliation for, the employee invoking her FMLA rights.  *Id.*; *see also Leonard v. Uhlich Children's Advantage Network*, 481 F.Supp.2d 931, 940 (N.D. Ill. 2007)(addressing constructive discharge in FMLA context); *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (6th Cir. 2004)(same).

A review of the record reveals that the conditions Parker faced when she resigned were not intolerable.  Zimmer attempted to reach compromise on the perceived problem of Parker's increasing absences by implementing an Attendance Improvement Plan.  This plan included a seven day notification requirement.  Parker took issue with the plan, both because she felt others were not held to the same standard, and because she felt "blindsided" by being given the warning in 2006 without ever being notified about a perceived attendance problem in 2005.  She also felt Zimmer's failure to engage in an interactive process by flatly denying her request to work from home back in 2003 contributed to her intolerable conditions.  Parker's sense of unfairness about Zimmer's implementation of the Attendance Improvement Plan, or even her difficulty in comporting to the plan, does not come close to the sorts of intolerable conditions that have

14

previously been found to justify a claim of constructive discharge.

Intolerable working conditions have been found in such environments where an employee was subjected to repeated sexual remarks and physically threatening conduct, *Robinson v. Sappington*, 351 F.3d 317, 330-31 (7th Cir. 2003); escalating sexual comments culminating in a physical assault and death threat, *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423-24 (7th Cir.1989); where a manager held a gun to the employee's temple, took a picture and then circulated the picture at a company meeting, stating that "this is what a nigger looks like with a gun to his head," *Taylor v. Western & Southern Life Ins. Co.,* 966 F.2d 1188, 1191, 1199 (7th Cir.1992); and where an employee's disputed sexual relationship with her supervisor resulted in a suicide attempt, *Snider v. Consolidated Coal Co.,* 973 F.2d 555, 557, 561 (7th Cir.1992).

Parker's troubles do not approach these levels. This would hold true even without the efforts Zimmer took to alleviate Parker's expressed concerns, but are certainly shown to be less than intolerable when considering those. Zimmer offered Parker a laptop to allow her to recline while working in her office. It also provided her with two different chairs, the second one of her own choosing, to alleviate her leg swelling problems while at work. *See Rooney v. Koch Air, LLC*, 410 F.3d 376, 383 (7th Cir. 2005)(rejecting a constructive discharge claim asserted by employee who resigned after injuring his back, where the employer provided two special chairs, a drafting table, and offered another position to the employee). Whatever discomforts were created by Parker's leg issues, they were not so intolerable as to prevent her from sitting and talking with coworkers during her two daily lunch breaks. Nor did they motivate her to fully pursue the accommodation of using a podium to stand at while in her office, an idea she proposed but apparently never followed up on with Zimmer's facilities personnel. As for the

15

situation created by Parker's placement on the Attendance Improvement Plan, there is no evidence that it made conditions intolerable, especially since at least some of Parker's previous requests for accommodation were listened to and accepted by Zimmer.  This time, instead of confronting Zimmer over her issues with the plan, Parker simply resigned. "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir.1997) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996)).

Even if Parker could show intolerable working conditions, the second half of the constructive discharge test is in doubt, as Parker admitted to motivating factors in her decision to quit that were unrelated to her FMLA activities.  Shortly before resigning, Parker had a meeting with Pat Riewoldt in which she said that, "if I have to work for Pat Hanlon . . .I'll have to leave." She also told Riewoldt and McShane that she didn't feel that she could "withstand the stress of working for Pat Hanlon and abide by the attendance policy."  Parker did not want to work under Hanlon because he had made what she took to be sexist remarks to her in 1999 when they were at same job level.

The intolerable working conditions that lead to a Plaintiff's termination must relate to her requests for FMLA benefits in order to justify an FMLA/constructive discharge claim.  *See Leonard*, 481 F.Supp.2d at 940.   While no one should have to suffer through sexist comments, Parker's suit is based on interference and retaliation against her for her FMLA activities, not her gender.  Her threat to quit if forced to work for Hanlon was too close in time to her actual resignation to ignore as a motivating factor.  Because of it, she cannot show that the allegedly intolerable conditions that caused her to resign were caused by her assertion of FMLA rights.

16

B.		Similarly Situated Employees

In addition to the fact that there is no remedy for Parker under the FMLA, Parker has failed to prove that she was treated less favorably than similarly situated employees who were not engaged in FMLA activities, thus dooming her FMLA retaliation claim.  *See Lewis v. School Dist. # 70*, 523 F.3d 730, 741 (7th Cir. 2008).  Under the indirect method of proving an FMLA retaliation claim (the only method Parker attempts to utilize), the plaintiff has the burden of showing that similarly situated employees are "directly comparable in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002)*; Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir.2002); *Peele v. Country Mut. Ins.* Co., 288 F.3d 319, 330 (7th Cir.2002).

In making this determination, I must look at all relevant factors, including whether the employees were "subject to the same standards." *Id.* (citing *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir.2000)).  "[A] plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue,* 219 F.3d at 617-18 (internal citations omitted).

The only evidence provided on this front is a collection of eighteen, single page emails collected by Parker.  They show various other employees routinely notifying Zimmer that they would be working from home and doing so in what might be described as a casual manner.  For example, one such employee wrote, "I am taking a sick day today.  I will do the ccb meeting from home and process the tickets." *See* Def.'s Br. [DE 50], Ex. 19 at 0200.

17

I am left to guess as to Zimmer's reaction to these emails, as there is no evidence presented showing how Zimmer responded to these notifications. But even if I assume that each and every one of these employees who worked from home met with no resistance from Zimmer, there is still nothing with which to determine whether they were similarly situated to Parker, who was placed on an Attendance Improvement Plan.

There is no evidence that any of the authors of those emails had accumulated as many absences as Parker had when she was placed on the plan.  Parker's attendance warning letter noted she was absent for ten full days and four half days in 2005 and was absent another thirty-three hours due to coming late.  In contrast, there is no indication that the authors of the emails had any previous attendance problems. Nor is there any information suggesting they are equivalent to Parker in terms of position, job experience, qualifications, supervisors, etc. Although Parker need not establish "identity" between herself and better treated employees, she must provide some evidence showing substantial similarity.  *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir.2007).

## **CONCLUSION**

Parker's cancer-related complications did not rise to the level of disability for purposes of the ADA, because Parker was not substantially limited in living or working, and she has not identified any other major life activity.  Her FMLA claims also fail because the evidence does not show that the conditions leading to her resignation were so intolerable so as constitute a constructive discharge, and she is left with no other harms that the FMLA operates to remedy. Parker has also failed to meet her burden of demonstrating similarly situated employees who were treated more favorably by Zimmer and so she cannot prevail under the indirect method of

her FMLA retaliation claim.  For these reasons, the Motion for Summary Judgment filed by Defendants Zimmer, Riewoldt, Mitchell, and McShane are **GRANTED**.  The clerk shall treat this action as terminated.

    **SO ORDERED**

    **ENTERED**: July 24, 2008

                                          s/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT